IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-646

Filed 4 March 2026

Wilson County, No. 23CRS372629-970

STATE OF NORTH CAROLINA

v.

TRAVIS RAY MERCER, Defendant.

Appeal by Defendant from judgment entered 15 January 2025 by Judge John M. Dunlow in Wilson County Superior Court. Heard in the Court of Appeals 15 January 2026.

*Attorney General Jeff Jackson, by Assistant Attorney General Ashley C. Council, for the State.*

*Attorney Joseph E. Gerber for Defendant–Appellant.*

MURRY, Judge.

Travis R. Mercer (Defendant) appeals from judgments entered upon guilty verdicts for false imprisonment and assault inflicting serious bodily injury. On appeal, Defendant contends that his counsel was per se ineffective because he "conceded [Defendant's] guilt to a lesser-included offense without his consent" and prejudicially ineffective because he "failed to move to suppress the fruits of a search conducted by a warrant issued from a facially insufficient indictment." Defendant further contends that the trial court erred by failing to intervene *ex mero motu* during

the State's closing argument. For the following reasons, this Court holds that Defendant did not receive any ineffective assistance of counsel (IAC) and that the trial court did not err by declining to intervene during the State's closing argument.

## I. Background

This matter arises out of an incident between Defendant and Glenda Lucas Randolph that resulted in injury to her shoulder. As of July 2023, Defendant and Randolph had known each other for eight years, of which they had spent at least four years in what Randolph described as a "boyfriend/girlfriend fiancé crazy rollercoaster" relationship. On the morning of 30 July 2023, Officer Luis Quesada of the Wilson County Police Department responded to a 911 call from a local gas station to find Randolph distraught and complaining of shoulder pain. Medical personnel transported Randolph to Wilson Medical Center, where doctors diagnosed and treated a closed right humeral fracture. Detective Taja S. Frails noted facial bruising and a sling on Randolph's right arm when she interviewed her at the hospital.

That same day, officers applied for a search warrant for Defendant's residence at 113 Garner Street in Wilson. The search warrant listed Detective "U.E. Johnson" and Detective "T. Frails" as co-applicants. The accompanying affidavit listed Detective Johnson as the applicant but bore Detective Frails's signature in the section for "signature of applicant." Magistrate T.M. Harris issued the search warrant, and the officers executed it that same day. Upon entering Defendant's residence, they found Defendant hiding behind a couch in the living room. While searching

Defendant's bedroom, the officers seized Randolph's feces-covered shoes and underwear as evidence. They also observed feces throughout the bedroom and a "[b]ody size hole that looked like someone slammed against the wall." Officer A.J. Burns logged an inventory of the recovered items.

On 6 November 2023, a grand jury indicted Defendant for first-degree kidnapping and assault inflicting serious bodily injury. At trial on 13 January 2025, the parties presented conflicting evidence. Detective Frails testified to finding Randolph's clothes and feces in Defendant's home, which the State accompanied by introducing Detective Frails's body-camera footage and photographs from the search.

As the prosecuting witness for the State, Randolph's testimony tended to show the following: On 29 July 2023, Randolph arrived home after a sobriety meeting when Defendant told her to come to his home and clean his room, which she did under protest. At some point, Defendant became agitated and threw her against the wall. Then, on 30 July 2023, when Randolph was sleeping in Defendant's bed, he pulled her off of the bed by her leg, causing her to fall and fracture her right shoulder. Defendant then stomped on her broken shoulder approximately three times and on her stomach, causing her to lose control of her bowels and defecate. When she requested medical treatment, he refused and ordered her to clean the room and her feces. After Defendant went back to sleep, Randolph, still covered in feces, donned Defendant's boxers and escaped to a gas station across the street.

Testifying in his own defense later at trial, Defendant offered a conflicting sequence of events and ultimately denied assaulting Randolph. He testified that they had both been using drugs and alcohol over multiple days, and that, when he had tried to get Randolph to stop smoking crack, she became belligerent, headbutted him, fell off of his bed, and landed on her shoulder. He stated that he did not know what caused Randolph to defecate but that she had a history of incontinence.

During closing arguments, defense counsel argued that the State had not met its evidentiary burden for first-degree kidnapping because "kidnapping . . . doesn't fit the circumstances of this case." He urged the jury to consider the lesser-included offenses as follows:

> Your choices would be guilty of first-degree kidnapping, guilty of second-degree kidnapping, guilty of felonious restraint, guilty of false imprisonment, or not guilty. I would suggest to you that you have two choices. You can find Defendant guilty of false imprisonment, which is a misdemeanor. Or you can get a not guilty in this case.

(Quotation modified.) In contrast, the State's closing argument emphasized to the jury that Randolph "told the truth and that's really all we can ask of her. She told you what happened. She told you what he did to her . . . . She told the truth." Defendant did not object to the State's remarks at trial.

On 15 January 2025, the jury found Defendant guilty of assault inflicting serious bodily injury and the lesser-included offense of false imprisonment. Finding Defendant to have a felony prior record level (PRL) V and a misdemeanor PRL III, the trial court consolidated the judgments and sentenced Defendant to 23–37 months'

imprisonment with 135 days' credit. Defendant timely appealed.

## II.    Jurisdiction

This Court has jurisdiction over Defendant's appeal from the trial court's final judgment under N.C.G.S. §§ 7A-27, 15A-1444. *See* N.C.G.S. § 7A-27(b) (2025) (final judgment of a trial court); *id.* § 15A-1444(a) (pleaded not guilty but found guilty). IAC claims generally "should be considered through motions for appropriate relief and not on direct appeal." *State v. Stroud*, 147 N.C. App. 549, 553 (2001). But because "the cold record reveals that no further investigation is required," this Court also has jurisdiction to determine Defendant's IAC claim on direct review. *State v. Fair*, 354 N.C. 131, 166 (2001).

## III.    Analysis

Defendant argues that his counsel was per se ineffective because he "conceded his guilt to a lesser-included offense without his consent" and prejudicially ineffective because he did not "move to suppress the fruits of a search conducted by a warrant issued from a facially insufficient indictment." Defendant also argues that the trial court erred by failing to intervene *ex mero motu* during the State's closing argument. For the following reasons, we hold that Defendant did not receive IAC and that the trial court did not err by failing to intervene during the State's closing argument.

### A. Ineffective Assistance of Counsel

Defendant asserts two Sixth Amendment right-to-counsel claims on both per se and prejudicially ineffective grounds. For the following reasons, we disagree on

both counts and hold that Defendant did not receive IAC on either ground.

The Federal Sixth Amendment guarantees a criminal defendant's right to effective assistance of counsel. *See* U.S. Const. amend. VI. A defense counsel violates his client's right by committing an error "so serious" as to "not function[ ] as the 'counsel' guaranteed by the Sixth Amendment," thus depriving the defendant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To bring a successful IAC claim on appeal, a defendant must establish both that (1) his counsel's deficient performance "fell below an objective standard of reasonableness" and (2) "the deficient performance prejudiced the defense." *Id.* To establish prejudice, Defendant "must show . . . a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Allen*, 360 N.C. 297, 316 (2006) (quoting *Strickland*, 466 U.S. at 694). A reasonable probability is that which is "sufficient to undermine confidence in the outcome," *Strickland*, 466 U.S. at 694, for which "a different result must be substantial, not just conceivable." *State v. Lane*, 271 N.C. App. 307, 313–14 (2020) (quotation omitted); *see State v. Phillips*, 365 N.C. 103, 121 (2011) (assessing prejudice by "looking at the totality of the evidence"). "The fact that counsel made an error, even an unreasonable error, does not warrant reversal of a conviction unless there is a reasonable probability that, but for counsel's errors, there would have been a different result in the proceedings." *State v. Braswell*, 312 N.C. 553, 563 (1985) (quoting *Strickland*, 466 U.S. at 694).

### 1.  *Per Se Ineffective Assistance of Counsel*

We first address Defendant's per se IAC claim.[1] Defendant contends that defense counsel improperly conceded his guilt by telling the jury that it "could find [Defendant] guilty of false imprisonment, which is a misdemeanor." He argues that "a full reading of [defense counsel's] closing argument shows that it was a plea to the jury to compromise by finding [Defendant] guilty of lesser-included misdemeanors within each charged felony." While we review prejudicial IAC claims under the *Strickland* standard, we review per se IAC claims under a *de novo* standard. *See State v. Moore*, 286 N.C. App. 341, 345 (2022); *Strickland*, 466 U.S. at 687. For the following reasons, we disagree and hold that Defendant did not receive per se IAC.

Despite its creation of a two-part test, *Strickland* left open the possibility of an error so egregious as to presume prejudice on appeal. *See Strickland*, 466 U.S. at 692. Our Supreme Court similarly recognized that some circumstances may be "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *State v. Harbison*, 315 N.C. 175, 180 (1985) (quoting *United States v. Cronic*, 466 U.S. 648, 658 (1984)) (holding that defense counsel's admission of guilt to lesser-charged offense without prior consent is so likely to prejudice defendant that it is reversible error per se). As a result, the *Harbison* Court established "ineffective assistance of counsel, per se in violation of the Sixth Amendment, . . . in every

---

[1] Defendant expressly limits this claim to defense counsel's comments regarding his first-degree kidnapping charge and subsequent false-imprisonment conviction. We limit our review accordingly.

criminal case in which the defendant's counsel admits the defendant's guilt to the jury without the defendant's consent." *Id.*

On appeal, we consider defense counsel's challenged statement contextually "to determine whether the statement was, in fact, a concession of defendant's guilt of a crime." *State v. Mills*, 205 N.C. App. 577, 587 (2010). Although a *Harbison* claim is generally based on an explicit admission of the defendant's guilt, "an implied admission of guilt . . . [may] constitute *Harbison* error" where the "statements to the jury cannot logically be interpreted as anything other than an implied concession of guilt to a charged offense." *State v. McAllister*, 375 N.C. 455, 475 (2020). But defense counsel *may* "remind the jury that it can find the defendant guilty of a lesser-included offense if it does not find [the] defendant guilty of the charged offense." *State v. Parker*, 290 N.C. App. 650, 654 (2023).

In assessing Defendant's claim, we find *State v. Parker* particularly instructive. In *Parker*, this Court held that the defense counsel did not concede the defendant's guilt by stating to the jury that it "decide[s] whether the use of force is excessive. But if it was excessive, that is voluntary manslaughter. That is not first[-]degree murder. That is not second[-]degree murder. That is voluntary manslaughter." *Id.* at 655. The Court in *Parker* noted that, because the defendant "was charged with first-degree murder, and the transcript reveals his counsel advocating for the jury to find [him] either not guilty, or" the lesser-included offense of "guilty of voluntary manslaughter," his defense counsel "neither stated nor

- 8 -

implied" the defendant's guilt. *Id.* Rather, he argued that the most serious crime of which the defendant could be convicted was a lesser-included offense. *Id.*; *see State v. Campbell*, 359 N.C. 644, 696 (2005) (holding that defense counsel did not concede guilt when explaining that, without evidence of specific intent, the most serious possible conviction was second-degree murder).

Here, defense counsel's statement that the jury "could find [Defendant] guilty of false imprisonment, which is a misdemeanor . . . or not guilty" is much more similar to the defense counsel's comments in *Parker* than those in *Harbison. See Parker*, 290 N.C. App. at 655. The record reveals that Defendant was charged with first-degree kidnapping and that defense counsel asked the jury to find him either guilty of false imprisonment or not guilty altogether. As in *Parker*, defense counsel's statements neither foreclosed a not-guilty verdict nor instructed the jury that Defendant was guilty of any offense; rather, they presented an alternative without implicitly or explicitly conceding Defendant's guilt to the lesser-included offense. Read in proper context, defense counsel's closing argument challenged the State's proof and preserved a not-guilty verdict as an available option by alternatively asking the jury to consider lesser-included offenses. Accordingly, because we hold that defense counsel neither stated nor implied Defendant's guilt, we need not address whether he obtained Defendant's prior consent. *See Harbison*, 315 N.C. at 180. Therefore,

Defendant did not receive per se IAC.[2]

## 2. *Prejudicially Ineffective Assistance of Counsel*

We next address Defendant's prejudicial IAC claim. He contends his counsel's failure to move to "suppress the fruits of a search conducted by a warrant issued from a facially insufficient indictment" rendered defense counsel prejudicially ineffective. Because "the affidavit supporting the application for the search warrant is the only information in the record on which basis the magistrate could have lawfully issued the search warrant," he argues that "the warrant should have never been issued." But Defendant's second claim fares no better than his first. For the following reasons, we disagree and hold that Defendant did not receive prejudicial IAC.

As discussed above, we analyze claims of prejudicial IAC under *Strickland*'s two-pronged test. *Strickland*, 466 U.S. at 687. Under this test, a reviewing court need not assess counsel's performance if "dispos[ing] of an ineffectiveness claim on the ground of . . . [in]sufficient prejudice" would be easier. *Id*. at 697. This Court has similarly held that an attorney's "failure to file a motion to suppress is not . . . [IAC] where the search or stop that led to the discovery of the evidence was lawful." *State v. Canty*, 224 N.C. App. 514, 517 (2012); *see State v. Hernandez*, 293 N.C. App. 283,

---

[2] We typically examine a defendant's claim under the "normal ineffectiveness standard set forth in *Strickland v. Washington*" upon determining that he did not receive per se IAC. *State v. McDowell*, 329 N.C. 363, 387 (1991). We do not do so here because Defendant argued *only* that defense counsel's conduct amounted to per se IAC and does not argue prejudice to the extent that his counsel's comments alternatively amounted to prejudicial IAC. *See* N.C. R. App. P. 28(b)(6); *State v. Bowman*, 274 N.C. App. 214, 220 (2020) (declining to reach *Strickland* analysis on same basis).

300 (2024) (no prejudicial IAC where, "had the defendant's trial counsel objected to the search warrant, the result of the proceeding would have been the same." (citation modified)). Accordingly, we must first assess the warrant's lawfulness to assess whether defense counsel then ineffectively failed to challenge it through a motion to suppress.

The Federal Fourth Amendment protects "[t]he right of the people to be secure against unreasonable searches and seizures" by requiring "[w]arrants issue[d] upon probable cause" that "particularly describe[ ] the place to be searched[ ] and the things to be seized," U.S. Const. amend. IV (ellipses omitted), which the Federal Fourth Amendment's Due Process Clause incorporates against the States. *See Mapp v. Ohio*, 367 U.S. 643 (1961) (incorporating Search and Seizure Clause); *Aguilar v. Texas*, 378 U.S. 108 (1964) (incorporating Warrants and Particular Description Clauses), *abrogated on other grounds by Illinois v. Gates*, 462 U.S. 213 (1983). "Probable cause . . . means a reasonable ground to believe that the proposed search will reveal the presence upon the premises to be searched of the objects sought and that those objects will aid in the apprehension or conviction of the offender." *State v. Campbell*, 282 N.C. 125, 128–29 (1972).

A search-warrant application must include (1) a statement of probable cause and (2) "one or more affidavits particularly setting forth the facts and circumstances establishing probable cause." N.C.G.S. § 15A-244(2)–(3) (2025). Any affidavit "must establish a nexus between the objects sought and the place to be searched," *State v.*

*Eddings*, 280 N.C. App. 204, 210 (2021), which must show that either "criminal activity actually occurred at the location to be searched or that the fruits of a crime that occurred elsewhere are observed at a certain place," *State v. Oates*, 224 N.C. App. 634, 644 (2012). "[I]nformation relayed from one officer to another" may supply the necessary "[p]robable cause for an affidavit . . . if that information was reported while the officer performed his or her duties." *State v. Rayfield*, 231 N.C. App. 632, 643 (2014).

In reviewing a warrant application, a magistrate must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. In doing so, the magistrate may consider "the totality of the circumstances" by drawing "reasonable inferences" from the affidavit's facts, *Eddings*, 280 N.C. App. at 210 (quoting *State v. Arrington*, 311 N.C. 633,638 (1972)), to determine "whether the evidence as a whole provides a substantial basis for concluding that probable cause exists," *State v. Beam*, 325 N.C. 217, 221 (1989).

Because "[p]robable cause does not mean actual and positive cause, nor does it import absolute certainty," *Campbell*, 282 N.C. at 129 (quotation omitted), our Supreme Court has cautioned against a "grudging or negative attitude by reviewing courts toward warrants" as "inconsistent with the Fourth Amendment's strong

preference for searches conducted pursuant to a warrant," *State v. Riggs*, 328 N.C. 213, 222 (1991) (quoting *Gates*, 462 U.S. at 236). Accordingly, "courts should not invalidate warrant[s] by interpreting affidavit[s] in a hypertechnical, rather than a commonsense, manner." *Id.* (alterations in original) (quoting *Gates*, 462 U.S. at 236). We instead afford "great deference" to "a magistrate's determination of probable cause," *State v. Brody*, 251 N.C. App. 812, 820–21 (2017) (quotation omitted), and must only "ensur[e] that the issuing magistrate had a 'substantial basis for . . . conclud[ing] that probable cause existed,' " *State v. McKinney*, 368 N.C. 161, 164 (2015) (second and third alterations in original) (quoting *Gates*, 462 U.S. 238 (1983)). Additionally, any officer acting within his territorial jurisdiction may execute a search warrant, regardless of whether he applied for it but "must, without unnecessary delay, return to the clerk of the issuing court the warrant together with a written inventory of the items seized." N.C.G.S. § 15A-257 (2025). "The inventory, if any, and return must be signed and sworn to by the officer who executed the warrant." *Id. But see State v. Tessnear*, 265 N.C. 319, 325 (1965) (officer on affidavit need not be same officer to execute warrant).

Here, considering the totality of the circumstances, the affidavit attached to the warrant application set out the underlying circumstances from which the issuing magistrate could find that probable cause existed to search Defendant's home. The affidavit also properly established a connection linking Defendant's home address to Randolph's injury by explaining that Randolph "advised she was assaulted by

[Defendant] at his residence for hours," stating that the clothing she wore during this assault "should still be located" inside Defendant's home. Given the "all the circumstances set forth in the affidavit," the magistrate reasonably concluded that "a fair probability" existed that an officer would find "contraband or evidence" of Randolph's assault at Defendant's residence. *Gates*, 462 U.S. at 238. Thus, the magistrate properly issued and the officers properly executed the warrant under N.C.G.S. § 15A-257.

Having determined that probable cause supported the issuance of the search warrant, we conclude that, "[h]ad Defendant's trial counsel objected to the [search warrant], the result of the proceeding would have been the same." *Hernandez*, 293 N.C. App. at 283. Even if defense counsel had moved to suppress the evidence obtained from the search warrant, the trial court would have properly denied the motion because the warrant was sufficient to establish probable cause. *See Strickland*, 466 U.S. at 688. For these reasons, Defendant cannot show a "reasonable probability that in the absence of counsel's alleged errors the result of the proceeding would have been different." *Braswell*, 312 N.C. at 563. Therefore, Defendant did not receive prejudicial IAC.

## B. Closing Argument

Finally, Defendant argues that the trial court erred by not intervening *ex mero motu* during the State's closing argument that the prosecuting witness "told the truth and that's all we can really ask of her." We disagree and hold that the trial court did

not so err.

Although a defendant's failure to object to an alleged error at trial ordinarily prevents him from raising the same issue on appeal, we recognize a "narrow exception . . . for statements during closing argument so grossly improper" that the trial court abuses its discretion per se by not intervening on its own initiative. *State v. Tart*, 372 N.C. 73, 81 (2019). We instead review these remarks for whether they "were so grossly improper that the trial court committed reversible error by failing to intervene *ex mero motu*," *State v. Jones*, 355 N.C. 117, 133 (2002), and thus grant relief only upon finding both gross impropriety *and* resulting prejudice, *see State v. Huey*, 370 N.C. 174, 179 (2017).

We recognize that prosecutors "owe honesty and fervor to the State and fairness to the defendant in the performance of their duties." *State v. Locklear*, 294 N.C. 210, 217 (1978). In closing arguments, "an attorney may not become abusive, inject his personal experiences, express his personal belief as to the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record." N.C.G.S. § 15A-1230 (2025). But within these parameters, attorneys have "wide latitude in their closing arguments to the jury, with the State being entitled to argue to the jury the law, the facts in evidence, and all reasonable inferences drawn therefrom," *State v. Fletcher*, 370 N.C. 313, 319 (2017) (quotation omitted), including the ability to "argue that the State's witnesses are credible" in order to "giv[e] the jury reasons to believe the State's evidence," *State v.*

*Augustine*, 359 N.C. 709, 725 (2005); *see State v. Arrington*, 299 N.C. App. 211, 215 (2025) (comments that witness "never lied" and "told you all the truth" were not improper when "made in the context of the prosecutor's arguments to the jury that [the witness's] testimony was credible because specific portions of his testimony matched the physical evidence presented").

Gross impropriety is an "exceedingly high bar" surmountable "only when the prosecutor's statements went so far beyond the parameters of propriety that the trial court" *must* "intervene to protect the rights of the parties and the sanctity of the proceedings." *State v. Reber*, 386 N.C. 153, 163 (2024). To show gross impropriety, a defendant must demonstrate that the "comments so infected the trial with unfairness that they rendered the conviction fundamentally unfair." *State v. Davis*, 349 N.C. 1, 23 (1998). We consider the State's closing argument "in the context in which the remarks were made and the overall factual circumstances to which they referred." *State v. Jaynes*, 353 N.C. 534, 559 (2001) (quotation omitted).

Here, the State's comments that Randolph "told the truth" occurred in the context of a closing argument in which the State argued that Randolph's testimony was credible after Defendant contradicted her account in his own testimony. As in *Wiley* and *Arrington*, the State did not impermissibly "vouch[ ]" for Randolph but instead "merely g[ave] the jury reasons to believe the State's witness" by advocating for her truthfulness in light of Defendant's testimony. *See Arrington*, N.C. App. at 215. Even assuming *arguendo* the impropriety of the State's comments, Defendant

has failed to show how they would prejudice him by "infect[ing] the trial with unfairness and thus render[ing] the conviction fundamentally unfair." *State v. Carroll*, 356 N.C. 526, 537 (2002) (quotation omitted). Therefore, we hold that the trial court did not prejudicially err by declining to intervene *ex mero motu* in response to the State's challenged remarks.

## IV. Conclusion

For the above reasons, this Court holds that Defendant did not receive per se or prejudicially ineffective assistance of counsel and that the trial court did not err by declining to intervene during the State's closing argument.

NO ERROR.

Chief Judge DILLON and Judge HAMPSON concur.